# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

HOWARD H. HALE,

      Plaintiff,

  v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

        **Civil Action 2:20-cv-4932**
        **Chief Judge Algenon L. Marbley**
        **Magistrate Judge Chelsey M. Vascura**

## REPORT AND RECOMMENDATION

Howard Hale ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 18), the Commissioner's Response in Opposition (ECF No. 19), Plaintiff's Reply (ECF No. 20) and the administrative record (ECF No. 15). For the reasons that follow, the undersigned **RECOMMENDS** that Plaintiff's Statement of Errors be **OVERRULED**, and the Commissioner's non-disability determination be **AFFIRMED**.

## I.  BACKGROUND

Plaintiff filed his application for DIB on June 8, 2017, alleging that he became disabled on November 14, 2007. (R. at 748.) Plaintiff's application was denied initially on November 20, 2017 (R. at 646–59, 660), and upon reconsideration on March 12, 2018 (R. at 661–80, 81). Plaintiff later amended his alleged date of onset to March 23, 2017. (R. at 757.) An Administrative Law Judge held a videoconference hearing on August 29, 2019, before issuing an unfavorable determination on October 10, 2019. (R. at 484–517, 451–83.) The Appeals Council

denied Plaintiff's request for review of that unfavorable, determination, and thus, it became final. (R. at 1–7.) Plaintiff timely commenced the instant action. (ECF No. 1.)

Plaintiff asserts that the ALJ committed reversible error when considering medical opinion evidence. Specifically, Plaintiff alleges the ALJ erred when assessing the medical opinion from state agency consultative examiner, Gregory S. Johnson, Ph.D. and the administrative findings from state agency reviewing psychologist, Vicki Warren, PhD. (ECF No. 18, at PageID # 2785–91.) The undersigned finds that these allegations of error lack merit.

## II.    THE ALJ's DECISION

On October 29, 2019, the ALJ issued her determination finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 451–83.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since March 23, 2017, the amended alleged date of onset. (R. at 457.) At step two, the ALJ found that Plaintiff had the following severe impairments: Degenerative Disc

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

2

Disease; thoracic, cervical and lumbar spine, post-laminectomy; Peripheral Neuropathy; Left Rotator Cuff Repair; Hips degenerative changes; and Depression.  (*Id*.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)  Before proceeding to step four, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally climb ramps and stairs, never climb ladders, ropes,or scaffolds, occasionally stoop, kneel, crouch, and crawl, can perform occasional overhead reaching on the left and frequent reaching all other directions on the left, no exposure to unprotected heights, frequent exposure to moving mechanical parts and motor vehicle operation, and no more than occasional exposure to vibration. In addition, he is limited to semi-skilled work and can have occasional interaction with co-workers, supervisors, and the public.

(R. at 461.)

The ALJ then relied on testimony from a vocational expert ("VE") to conclude at steps four and five that Plaintiff was unable to perform his past relevant work but that given his age, education, work experience, and RFC, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  (R.  at 475–76.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act since March 5, 2012.  (R. at 477.)

### III.    RELEVANT RECORD EVIDENCE[2]

#### A.    Plaintiff's Testimony

Plaintiff, who appeared with counsel, testified to all the following facts about his mental limitations at the August 29, 2019 videoconference hearing.  On a typical day, Plaintiff would

---

[2] Because Plaintiff's allegations of error pertain only to his mental limitations, the Court's discussion and analysis is limited to the same.

get up, take a shower, and "pretty much" sit around and watch television.  (R. at 498.)  Plaintiff did not go out and "pretty much" stayed to himself because of his depression.  (*Id*.)  Plaintiff explained that since he had stopped working, he felt worthless and like "a bum."  (R. at 499.)  He stated that he was taking medication and participating in therapy and that "[i]t's getting better. A little at a time."  (R. at 499–500.)  He did not feel as down as much or depressed.  (R. at 500.)  He went to counseling every two weeks.  (R. at 501.)

Plaintiff also testified to the following facts.  Plaintiff's wife, who is disabled, prepared Plaintiff's food and grocery shopped.  (R. at 498.)  Plaintiff's wife also did all housework although Plaintiff would help by taking dishes out of the dishwasher and clothes out of the dryer when he was able.  (R. at 498–99.)  Plaintiff's wife also took care of the finances because when it came to money, Plaintiff would forget.  (R. at 500-501.)  Plaintiff believed that his mental health impacted his ability to work because the the stress and anxiety would cause him to be forgetful and impair his concentration.  (R. at 502–503.)

## B.    Treatment Records

Examinations on December 7, 2016, and January 9, 2017, found that Plaintiff was alert and oriented to person, place, and time.  (R. at 832, 835.)

On March 13, and 27, 2017 examinations found that Plaintiff had normal mood, affect, and behavior.  (R. at 1091, 2499.)  Further, Plaintiff's affect was not blunt, labile, or inappropriate.  (*Id*.)  Nor was he aggressive, hyperactive, slowed, withdrawn, or combative.  (*Id*.)  Plaintiff's cognition and memory were also normal and not impaired.  (*Id*.)  Plaintiff exhibited normal recent and remote memory.  (*Id*.)  He did not exhibit a depressed mood.  (*Id*.)

Medical records dated March 24, 26, and 28, 2017, indicated that Plaintiff's depression/anxiety were stable.  (R. at 1037, 1057, 1073.) Additional examinations on March 24,

4

25, and 26, 2017, found that Plaintiff's mood was appropriate and cooperative. (R. at 1055, 1058, 1083.) On March 25 and 27, 2017, Plaintiff's mood and affect were appropriate. (R. at 845, 1080, 1376.)

An April 7, 2017, examination found that Plaintiff was oriented to time, place, person, and situation and that he had appropriate mood and affect. (R. at 1371.)

On August 14, 2017, Plaintiff's physician, Jeffrey Haggenjos, D.O., completed a Social Security form indicating that he had treated Plaintiff for seven-to-ten years for various physical ailments and that Plaintiff's depression interfered with his treatment. (R. at 1367–69.) Dr. Haggenjos also wrote that Plaintiff was "unable to work." (*Id*.)

Medical records from November 5, 2017, indicate that upon examination, Plaintiff had normal mood, affect, behavior, judgment, and thought content. (R. at 1522.)

On January 4, 2018, Plaintiff sought treatment from an emergency room for dizziness. (R. at 1560.) Plaintiff's mood, affect, behavior, and speech were noral. (R. at 1562.) His mood did not appear anxious and his mood was not angry. (*Id*.) His speech was not rapid or pressured. (*Id*.) When discharged that same day, Plaintiff had normal cognition but decreased affect. (R. at 1559.)

On January 30, 2018, Plaintiff's speech was appropriate, but his affect was withdrawn. (R. at 1615.) He denied suicidal or homicidal ideations. (*Id*.) Notes dated February 6, 2018, state that Plaintiff had a normal affect. (R. at 1457.)

At a February 13, 2018 examination by Sudhir Dubey, Psy.D., Plaintiff reported that he had been receiving psychotropic medication from his family doctors for about five years. (R. at 1451.) Plaintiff additionally indicated that "his medication do help keep his mood stable." (*Id*.) Plaintiff reported that he could not work outside the home because of his pain problem. (*Id*.) Dr.

Dubey wrote that Plaintiff's depressive symptoms "are well-managed and within normal limits at this time."  (R. at 1452.)

A March 13, 2018 examination found that Plaintiff's affect was normal.  (R. at 1473.) On March 27, 2018, an examination found that Plaintiff was awake, alert, and oriented x3.  (R. at 1683.)  His attention, mood, language, affect, speech, cognition, and knowledge were all normal in conversation that day.  (*Id*.)

On March 29, and April 10, 2018, examinations revealed that Plaintiff had normal speech and appropriate affect.  (R. at 1611, 1613.)  Plaintiff also denied suicidal or homicidal ideations. (*Id*.)

On July 11 and 16, 2018, Plaintiff was alert and oriented x3, and he had appropriate affect.  (R. at 1768, 1816.)  Notes dated July 16, 2018, indicate that Plaintiff's chronic depression was controlled with anti-depressant medications and that his anxiety was controlled with anti-anxiety medications.  (R. at 1812.)

On October 3, 2018, Plaintiff reported that his Effexor was not working and that he had been moody for the last two years since he had quit working.  (R. at 2599.)  Plaintiff's speech and affect were appropriate, and he denied suicidal and homicidal ideations.  (R. at 2605.)

An October 15, 2018 examination found that Plaintiff had normal mood, affect, and behavior.  (R. at 1958.)

On October 18, 2018, Plaintiff reported that his Prozac worked better than other drugs but that he had discontinued using it when it became "not therapeutic."  (R. at 1648.)  He also reported that he had discontinued using Zoloft when it ceased being effective. (*Id*.)  On the other hand, he reported that Paxil was helpful and slowed down his racing thoughts and that he was not sure why he had discontinued using it.  (*Id*.)  In addition, he took Xanax for sleep but it was

overly effective and made him sleepy. (*Id*.) Plaintiff was unsure why he had discontinued using Xanax. (*Id*.) Plaintiff was well groomed, he had average eye contact and demeanor, and his speech was clear. (R. at 1653.) His mood was depressed and his affect flat. (*Id*.) Plaintiff reported no delusions, thoughts of self-abuse, or aggressive thoughts. (R. at 1653–54.) His thought processes were logical, but he reported memory and attention/concentration impairments. (R. 1654.) Plaintiff's behavior was cooperative. (*Id*.)

On October 31, 2018, Plaintiff indicated that he had started Prozac but did not notice much of a difference with it. (R. at 1656.) He also indicated that he was taking Buspar but did not feel it was helpful. (R. at 1656, 1657.) He reported that he continued to feel depressed and irritable and had mood swings most days. (R. at1656.) He stated that he had not been able to work for the past few years and that his depression had worsened. (*Id*.) A mental status examination found that Plaintiff's appearance was within normal limits. (R. at 1658.) Plaintiff was noted to isolate and socially withdraw. (R. at 1657–58.) Plaintiff's mood was depressed, his affect flat, and he had difficulty concentrating. (R. at 1658.) But he was oriented to person, place, and time; he had average intellectual functioning; no apparent insight deficiencies; moderate judgment; soft speech; and fair appetite and ability to sleep. (R. at 1658–59.)

On November 17, 2018, Plaintiff reported that he was doing a little better with his depression. (R. at 2613.) Plaintiff's speech and affect were appropriate, and he denied suicidal and homicidal ideations. (*Id*.)

On November 21, 2018, Plaintiff reported that he noticed a slight benefit from starting Prozac in that it took longer for him to get irritated but that he continued to feel down. (R. at 1662.) Mental status examinations that day and on December 19, 2018, found that Plaintiff's mood was depressed. (R. at 1662, 1665.) Plaintiff had a cooperative and pleasant attitude; good

7

eye contact; and he was oriented to person, place, and time. (*Id*.) Plaintiff also had no agitation; steady gait; and normal rate and rhythm to his speech. (*Id*.) His affect and thought processes were appropriate. (*Id*.) Plaintiff's memory was focused, and he had average intelligence and fund of knowledge. (R. at 1662, 1665–66.) His insight and judgment were fair. (R. at 1663, 1666.) On January 22, 2019, Plaintiff reported that his mood was "still a little snippy" but that he felt his mood had improved. (R. at 1668.) A mental status examination on that day found that Plaintiff's mood was flat instead of depressed, but otherwise reflected the same findings as the examinations in November and December 2018. (R. at 1668–69.) On February 22, March 19, April 16, and May 14, 2019, examinations revealed that Plaintiff's mood was neutral and his affect flat but made the same findings as the examinations in November and December 2018 and January 2019. (R. at 1671–72, 1674–75, 1677–78, 1680–81.) Plaintiff noted at the March appointment that Doxepin was working better than Trazodone although he still felt down at times, felt depressed, and got irritable a couple times a week. (R. at 1674.)

On December 10 and 20, 2018, Plaintiff was alert and oriented x3, made good eye contact, and had a normal affect. (R. at 1925, 1994.)

An examination on January 10, 2018, found that Plaintiff was oriented to person, place, problem, and time; he had appropriate mood and affect; and his recent and remote memory were intact. (R. at 1951.) On January 15, 2019, Plaintiff was awake, alert, and oriented x3. (R. at 1686.) His attention, mood, language, affect, speech, cognition, and knowledge were all normal in conversation that day. (*Id*.)

An examination on April 10, 2019, found that Plaintiff was alert and oriented and in no acute distress. (R. at 2699.) On June 7, 2019, Plaintiff reported that he was still kind of down

and that he had been on Abilify for four weeks but had not seen much of a difference. (R. at 2061.)

On July 5, 2019, Plaintiff reported that his depression was a 7 on a 10-point scale. (R. at 565.) On July 9, 2019, Plaintiff reported that he was "doing well" that month. (R. at 548.) Plaintiff "endorsed some depressed days" but indicated that "they're less . . . than they used to be, but there's no upswing." (*Id.*) An examination found that Plaintiff was cooperative and pleasant; had good eye contact; and was oriented to person place, and time. (*Id.*) He also exhibited no agitation; had normal rate and rhythm to his speech; a neutral mood; and a flat affect, although it was less flat than usual and Plaintiff laughed more. (*Id.*) Plaintiff also had appropriate thought processes, focused memory, average fund of knowledge and intelligence, and fair judgment and insight. (R. at 548–49.)

On July 15, 2019, Plaintiff reported that his depression was a 4-5 on a 10-point scale. (R. at 567.) On August 1, 2019, Plaintiff reported that his depression was a 5 on a 10-point scale. (R. at 569.)

A July 21, 2019 examination found that Plaintiff had normal mood, affect, behavior, judgment, and thought content. (R. at 2663.) Another examination that day found that he had appropriate mood and affect. (R. at 2683.)

On August 6, 2019, Plaintiff reported that he had rotator cuff surgery the prior month and a possible pulmonary embolism. (R. at 551.) Plaintiff additionally reported that he had been anxious since his episode and that he had been pacing more and sleeping poorly. (R. at 554.) On September 3, 2019, Plaintiff endorsed some depressive symptoms and that he was "just not getting joy out of things . . . [he] tinker[ed] with stuff but . . . got bored easily." (*Id.*) Mental status examinations at both visits found that Plaintiff was cooperative and pleasant; had good eye

contact; and was oriented to person place, and time. (R. at 551, 554.) He also exhibited no

agitation; had normal rate and rhythm to his speech; a neutral mood; and appropriate affect. (*Id*.)

Plaintiff also had appropriate thought processes, focused memory, average fund of knowledge

and intelligence, and fair judgment and insight. (R. at 551–52, 545–55.)

On August 15, and September 3, 2019, Plaintiff reported that his depression was a 5 on a

10-point scale. (R. at 571, 573.) On September 11, 2019, Plaintiff was observed to be awake,

alert, and oriented. (R. at 601.)

On October 1, 2019, Plaintiff denied major lows but endorsed symptoms of anhedonia,

pacing, and anxiety since going to the hospital in July with shortness of breath. (R. at 557.) But

he was sleeping well through the night with use of Doxepin. (*Id*.) A mental status examination

revealed the same findings as examinations on August 6, and September 3, 2019, except that

Plaintiff's affect was flat instead of appropriate. (R. at 551, 554, 557.)

At an examination on October 1, 2019, Plaintiff was well groomed, he had average eye

contact and demeanor, and his speech was clear. (R. at 562–63.) Plaintiff's mood was euthymic

and his affect was full. (R. at 562.) Plaintiff reported no delusions, thoughts of self-abuse,

aggressive thoughts, or hallucinations. (*Id*.) His thought processes were logical, and he did not

report memory, orientation, or attention/concentration impairments. (R. 563–64.) Plaintiff's

behavior was cooperative. (R. at 564.)

On October 25, 2019, a mental status examination found that Plaintiff's behavior, thought

content, and judgment were normal. (R. at 594.)

On November 26, 2019, Plaintiff underwent a coronary bi-pass. (R. at 94.)

Examinations on November 25, 27, 28, and 30, 2019, found that Plaintiff had appropriate mood

and affect. (R. at 23, 61, 71, 81.) He experienced some post-operative anxiety so his

prescription for Buspar was increased to three doses a day before he was released from the hospital. (R. at 95.)

### C. Consultative Examinations

Plaintiff was examined by state agency consultative psychological examiner Gregory S. Johnson, Ph.D. on October 18, 2017, and again on January 31, 2018. (R. at 1387–97, 1440–50.) After the first examination, Dr. Johnson opined that Plaintiff had "little to no elevated risk for dysfunctions" understanding and remembering instructions given to him in the workplace and no "elevated risk for dysfunction" carrying out instructions in the workplace to completion. (R. at 1394.) After the second examination, however, Dr. Johnson opined that although Plaintiff still had "no elevated risk for dysfunction" understanding instructions, his risk was "somewhat elevated" for both remembering and carrying out instructions. (R. at 1447–48.)

Dr. Johnson initially opined that Plaintiff's had no risk for dysfunction maintaining attention and concentration with simple tasks but had a somewhat elevated risk with multi-step tasks. (R. at 1395.) After the second examination, Dr. Johnsons opined that Plaintiff's risks were higher— his risk for dysfunction in attention and concentration was somewhat elevated for simple tasks and elevated for multi-step tasks. (R. at 1448.) After both examinations, however, Dr. Johnson opined that Plaintiff's risk for dysfunction in maintaining persistence and pace was somewhat elevated for simple tasks and elevated for multi-step tasks. (R. at 1395, 1448.)

In addition, after the initial examination, Dr. Johnson opined that Plaintiff had no risk for inappropriate responses to expected interactions with coworkers or scrutiny from supervisors. (R. at 1395.) After the second examination, Dr. Johnson opined that Plaintiff's risk was higher— he opined that Plaintiff had a little-to-somewhat elevated risk for such inappropriate responses. (R. at 1449.)

11

### D.    State Agency Reviewers

Plaintiff's file was reviewed at the initial level on November 8, 2017, by Irma Johnston, Psy.D.  (R. at 654.)  Dr. Johnston found that Plaintiff had no limitations in understanding, remembering, or applying information, and that Plaintiff only had mild limitations with regard to his ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself.  (R. at 654.)

Plaintiff's file was reviewed at the reconsideration level on February 20, 2018, by Vicki Warren, Ph.D.  (R. at 676–78.)  Dr. Warren found that Plaintiff was able to understand, remember, and complete simple one-to-three step tasks due to Plaintiff's understanding and memory limitations and his sustained concentration and persistence limitations.  (R. at 677.)  Dr. Warren further found that supervision needed to be available to Plaintiff to redirect when needed. (*Id*.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.     ANALYSIS

As previously noted, Plaintiff alleges that the ALJ erred committed reversible error when assessing the administrative findings from state agency reviewing psychologist, Vicki Warren, PhD., and the medical opinion from state agency consultative examiner, Gregory S. Johnson, Ph.D.  (ECF No. 18, at PageID # 2785–91.)  The undersigned disagrees.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2012).  A claimant's RFC assessment must be based on all the relevant evidence in a his or her case file.  *Id*.  The governing

regulations[3] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[4]  20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)–(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program s policies and evidentiary requirements."  §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered.  §§ 404.1520c(b)(2); 416.920c(b)(2).  And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so.  *Id*.  If, however, an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not

---

[3]  Plaintiff's application was filed after March 27, 2017.  Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed.  *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

[4]  A prior administrative finding is defined as a finding about a medical issue made by a Federal or State agency medical or psychological consultant at a prior level of review.  *See* §§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive

factors . . . . . " §§ 404.1520c(b)(3); 416.920c(b)(3).

In addition, when a medical source provides multiple opinions, the ALJ need not

articulate how he or she evaluated each medical opinion individually.  §§ 404.1520c(b)(1);

416.920c(b)(1).  Instead, the ALJ must "articulate how [he or she] considered the medical

opinions . . . from that medical source together in a single analysis using the factors listed

[above], as appropriate."  *Id.*

### A.  Dr. Johnson

Plaintiff challenges the ALJ's assessment of Dr. Johnson's opinions.  The ALJ first

summarized Dr. Johnson's opinion as follows:

> Gregory Johnson, Ph.D,, the psychiatric consultative examiner, on initial
> examination opined that the claimant has little to no elevated risk for
> dysfunction in remembering instructions or in carrying out instructions to
> completion given to him in the workplace, the claimant's excessive worry
> would adversely impact attention and concentration tasks, he has little to no
> elevated risk for dysfunction in maintaining attention and concentration/pace
> and persistence in simple tasks and a somewhat elevated risk for dysfunction in
> maintaining attention and concentration/pace and persistence in multi-step
> tasks in the workplace, he does not have an elevated risk for inappropriate
> responses to expected interactions with coworkers or the expected scrutiny
> from supervisors, and he has little to no elevated risk for inappropriate
> responses to expected workplace pressures. Lastly, he would not need assistance
> in managing finances . . . .   Later, Dr. Johnson, opined in January 2018 that
> the claimant has a somewhat elevated risk for dysfunction in carrying out and
> remembering instructions given to him in the workplace, he has a somewhat
> elevated risk for dysfunction in maintaining attention and concentration,
> persistence and pace in simple tasks in the workplace and an elevated risk for
> dysfunction in maintaining attention and concentration, persistence and pace in
> multi-step tasks in the workplace, he has little to somewhat elevated risk for
> inappropriate responses to expected interactions with coworkers and to the
> expected scrutiny of supervisors, and he has little to no elevated risk for
> inappropriate responses to expected workplace pressures. Lastly, he would not
> need assistance in managing his finances . . . .

(R. at 473.)  The ALJ then assessed Dr. Johnson's opinions and determined that they were not persuasive.  The ALJ explained:

> The opinion of Dr. Johnson is not specifically stated using vocationally relevant terms and is somewhat vague. Moreover, the undersigned finds the opinions unpersuasive, overall, as the evidence received at the hearing level supports that the claimant has no greater mental limitations than those set forth in the above residual functional capacity herein as it relates to his ability to maintain concentration, persistence, or pace and interacting with others in the work setting due to his depression which is controlled by medications . . . .

(R. at 473–74.)

The undersigned finds that the ALJ did not err when assessing Dr. Johnson's opinions. First, the ALJ determined that Dr. Johnson's opinions were not specifically stated using vocationally relevant terms and was somewhat vague.   That is an accurate characterization—Dr. Johnson opined that Plaintiff had "elevated risks" and "somewhat elevated risks" of dysfunction in certain domains.  But he did not indicate or define the specific work-related limitations that resulted from those risks.  "An ALJ can appropriately reject limitations that are vague and not defined."  *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x. 472, 476 (6th Cir. 2008). *See also Wajnryb v. Colvin*, No. 2:14-CV-0170, 2014 WL 5803010, at *9 (S.D. Ohio Nov. 7, 2014) (finding ALJ did not err when assigning some weight to opinion that plaintiff may be limited by her pain because opinion did not indicate origin of pain or opine how pain was limiting in vocationally relevant terms), *report and recommendation adopted*, No. 2:14-CV-170, 2015 WL 418020 (S.D. Ohio Jan. 30, 2015); *Coleman v. Comm'r of Soc. Sec.*, No. 20-11568, 2021 WL 2560242, at *14 (E.D. Mich. June 7, 2021), (ALJ did not err when discounting opinion that plaintiff avoid triggers to migraines because opinion was not stated in vocationally relevant terms), *report and recommendation adopted*, No. 20-CV-11568, 2021 WL 2550866 (E.D. Mich. June 22, 2021); *Young v. Saul*, No. 1:20-cv-00059, 2021 WL 4295152, at * 8 (W.D. Ky. April

27, 2021) (ALJ did not err when discounting weight given to consultative examiner's opinions that plaintiff could probably understand and remember tasks with mild difficulty and that he was mildly limited or moderately limited in other domains because opinions were not stated in vocationally relevant terms).

Plaintiff asserts that it was error or the ALJ to discount Dr. Johnson's opinions for vagueness because the newer regulations that govern Plaintiff's claim require an ALJ to consider and discuss an opinion's supportability and consistency. (ECF No. 20, at PageID # 2806–07.) The undersigned is not persuaded that the new regulations supplant the need for defined limitations. Dr. Johnson, for example, opined that Plaintiff had a little to somewhat elevated risk for inappropriate responses to interactions with coworkers. (R. at 1449.) But Dr. Johnson did not opine if that meant that Plaintiff was limited to superficial interactions with coworkers or if Plaintiff was limited occasional interactions with coworkers, or if this little to elevated risk did not result in an actual limitation of any kind. In short, it is difficult to see how the ALJ would assess the supportability and consistency of Dr. Johnson's opinions given that he did not opine any specific limitations.

In any event, the ALJ also explained that Dr. Johnson's opinions that Plaintiff had risks for dysfunction in concentration, persistence, pace, and interactions with others because of his depression was not persuasive because Plaintiff's depression was controlled by medications. (R. at 474.) Stated differently, the ALJ explained that Dr. Johnson's opinions were not consistent with other record evidence that Plaintiff's depression was under control with medications. Substantial evidence supports that determination. Medical records dated March 24, 26, and 28, 2017, indicated that Plaintiff's depression/anxiety were stable. (R. at 1037, 1057, 1073.) On February 13, 2018, Plaintiff reported that "his medications do help keep his mood stable." (R. at

17

1451.)  That same day, Dr. Dubey wrote that Plaintiff's "depressive symptoms were well managed and within normal limits."  (*Id.*)  On July 9, 2019, Plaintiff reported that he was "doing well" that month and although he endorsed having some depressed days, he also indicated that he had fewer of them.  (R. at 565.)  On July 15, 2019, Plaintiff reported that his depression was a 4-5 on a 10-point scale.  (R. at 567.)  Notes dated July 16, 2018, indicate that Plaintiff's chronic depression was controlled with anti-depressant medications.  (R. at 1812.)  On August 1 and 15, and September 3, 2019, Plaintiff reported that his depression was a 5 on a 10-point scale.  (R. at 569, 571, 573.)  At the August 29, 2019, hearing, Plaintiff testified that he was taking medication and participating in therapy and that "[i]t's getting better. A little at a time."  (R. at 499–500.)  He also testified that he did not feel as down as much or depressed.  (R. at 500.)

In addition, examinations often revealed that Plaintiff had normal or appropriate mood (R. at 1091, 2499, 1055, 1058, 1083, 845, 1080, 1376, 1371, 1522, 1562, 1683, 1958, 1951, 1686, 2663, 2683, 23, 61, 71, 81), normal or appropriate affect (R. at 1091, 2499, 845, 1080, 1376, 1371, 1522, 1562, 1457, 1473, 1683, 1611, 1613, 1768, 1816, 2605, 1958, 2613, 1662, 1665, 1668, 1925, 1994, 1951, 1686, 2663, 2683, 551, 554, 23, 61, 71, 81), and normal or appropriate behavior (R. at 1091, 2499, 1522, 1562, 1958, 2663).

In sum, the undersigned finds that the ALJ did not er when assessing Dr. Johnson's opinions.  Plaintiff's first allegation of error lacks merit.

**B.     Dr. Warren**

Plaintiff also challenges the ALJ's assessment of the Dr. Warren's findings at the reconsideration level.  The ALJ wrote:

> The State agency psychiatric consultant, Vicki Warren, PhD, at the reconsideration level, opined in the mental residual functional capacity assessment that the claimant is able to understand, remember, or carry out simple 1 to 3 step tasks and supervision should be available to redirect when needed . . . .  The undersigned finds suggested

18

limitations of Dr. Warren to be minimally persuasive as the evidence demonstrates that the claimant was capable of performing greater than simple 1 to 3 step tasks in previous employment, he performed quite well during a mental status exam as he was able to recall 3 out of 3 words after a 5 minute delay, he successfully repeated 5 digits forward and 3 digits in reverse, he accurately solved 4 out of 4 arithmetic problems that were presented to him, and he completed a serial 3's subtraction task from 30 to 0 in 10 seconds with no errors. Additionally, he was noted to have no problems relating with his former co-workers and supervisors . . . . Accordingly, the undersigned has accounted for the claimant's mental limitations caused by his depression including irritabilityand the effects of his pain as it relates to his ability to his ability to maintain concentration, persistence, or pace, by limiting the claimant to semi-skilled work with occasional interaction with co-workers, supervisors, and the public.

(R. at 473.)

The undersigned finds that the ALJ did not err when assessing Dr. Warren's findings. The ALJ determined that Dr. Warren's findings lacked support— the ALJ explicitly cited findings from Dr. Johnson's first and second evaluations that did not support a finding that Plaintiff was limited to understanding, recalling, and completing one to three step tasks. Specifically, the ALJ noted that Plaintiff was able to recall three out of three 3 words after a five-minute delay and successfully repeat five digits forward and three digits in reverse— which were the results of testing immediate memory tests during Dr. Johnson's first examination. (R. at 473, 1393.)[5] The ALJ also noted that Plaintiff was able to solve four out of four arithmetic problems and complete a serial three subtraction task from zero to 30 in ten seconds with no errors— which were the results of testing at both of Dr. Johnson's evaluations. (R. at 473, 1393, 1445.) The ALJ also cited findings from Dr. Johnson's first and second evaluations that did not support Dr. Warren's finding that Plaintiff was limited to work where supervision would be available to redirect. (R. at 473.) The ALJ explained that it was "noted that Plaintiff had no problems

---

[5] At Dr. Johnsons' second examination, Plaintiff's performance on immediate memory tasks was both worse and better. At the second examination, Plaintiff recalled only one out of three words after a five-minute delay instead of three out of three words. (R. at 1393, 1445.) But Plaintiff also repeated six digits forward and three digits in reverse instead of five digits forward and three in reverse. (*Id.*)

relating with his former co-workers and supervisors." (*Id.*)  And indeed, at both of Dr.

Johnson's examinations, Plaintiff reported that he did not have history of receiving reprimands

for not completing tasks or for not maintaining pace in the workplace, nor did he have a history

of problems interacting with coworkers or supervisors.  (R. at 1390, 1443.)

    Plaintiff asserts that the ALJ erred because the ALJ did not explicitly discuss the

supportability and consistency factors.  The new regulations are less demanding than the former

rules governing the evaluation of medical opinions and findings but "they still require that the

ALJ provide a coherent explanation of his reasoning."  *Lester v. Saul*, No. 20-01364, 2020 WL

8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom.*

*Lester v. Comm'r of Soc. Sec.*, No. 20-1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021).  As

one Court recently explained,

> The new regulations "set forth a 'minimum level of articulation' to be provided in
> determinations and decisions, in order to 'provide sufficient rationale for a
> reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495,
> 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01
> (2017)).  An "ALJ's failure . . .  to meet these minimum levels of articulation
> frustrates [the] court's ability to determine whether [claimant's] disability
> determination was supported by substantial evidence."  *Vaughn v. Comm'r of Soc.*
> *Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

*Hardy v. Comm'r of Soc. Sec.*, No. 20-101918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13,

2021).  In this case, the undersigned finds that even though the ALJ did not use the term

"supportability," it is clear that the ALJ considered that factor and found it lacking because he

explicitly cited portions of Dr. Johnson's evaluations that did not support Dr. Warren's findings.

That provided a sufficient rationale for tis Court to review the ALJ's analysis.

    The ALJ did not implicitly or explicitly discuss the consistency factor because he found

that supportability was lacking.  The record reflects, however, that examinations found that

Plaintiff had normal attention (R. at 1683, 1686, 563-64), no issues with concentration (R. 563-

64), no issues with memory (R. at 1091, 2499, 563-64) and no issues with or had normal cognition (R. at 1091, 2499, 1683).  Moreover, examinations also found that Plaintiff's memory was intact (R. at 1951), or that he had focused memory (R. at 1662, 1665-66, 548-49, 551-52, 545-55).

In sum, the undersigned finds that the ALJ did not er when assessing Dr. Warren's findings.  Plaintiff's second allegation of error lacks merit.

## VI.    RECOMMENDED DISPOSITION

For all the foregoing reasons, the Court finds that Plaintiff's allegations of error are not well taken.  Accordingly, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's non-disability determination is **AFFIRMED**.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE